**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

TRAMAINE BROWN                          )
91240-053-CAMP 1                        )
407 SUNBURY STREET                      )
POST OFFICE BOX 670                     )
MINERSVILLE, PA  17954                  )
                                        )
    Plaintiff,       )
                                        )
VS.                                     )     Civil Action No. _1:22-CV-0404_
                                        )
UNITED STATES OF AMERICA                )
Serve: Attorney General of the United States   )
950 PENNSYLVANIA AVENUE, NW             )
WASHINGTON, D.C.        20530-0001      )
                                        )
Defendant.                              )

**ORIGINAL COMPLAINT**

COMES NOW, the Plaintiff, Elijah Iverson, and represent to the Court, that:

**JURISDICTION**

1.    This Court has jurisdiction over this matter pursuant to the Federal Tort Claims Act, 28 U.S.C. §1346, in that the claims alleged in this action arises out of the negligent or wrongful acts and omissions of employees of the Government while acting within the scope of his or her office or employment.

**PARTIES**

2.    Plaintiff is a resident of the State of New York, and is currently confined at the SCP Schuylkill in Minersville, Pennsylvania serving a federal sentence.

3.    Defendant is sued under the Federal Tort Claims Act for the negligent, wrongful acts and omissions of employees of the SCP Schuylkill, an agency of the Defendant, while acting within the scope of their office and employment.

## FACTS COMMON TO ALL COUNTS

The novel coronavirus known as SARS-nCoV-2 causes COVID-19, a deadly respiratory infection for which no known cure or vaccine was available. On March 11, 2020, the World Health Organization declared COVID-19 a global pandemic. At that time, the United States registered 1,267 of the 118,000 confirmed global cases and 38 of the 4,291 deaths. The virus is highly infectious. The virus spreads primarily through close contact with an infected person (who may be asymptomatic), including through respiratory droplets produced when the infected person coughs, sneezes, or talks. The virus can also spread through contact with a contaminated surface.

It is universally recognized that COVID-19 poses a particularly tough challenge for the incarcerated citizenry. Social distancing and rigorous personal hygiene remain important combatants to the virus but those housed in prisons, like the Plaintiff, must eat, sleep, talk, and tend to their every personal need in each other's close physical space. COVID-19 is especially deadly for the detained population because they are disproportionately more likely to suffer from chronic medical conditions. In recognition of this stark reality, the Center for Disease Control ("CDC") on March 23, 2020, issued guidance for officials operating detention facilities to help stop the spread of COVID-19. (CDC Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities).

The guidance included detailed recommendations about proper hygiene and cleaning practices, social distancing, evaluating symptoms, and the use of medical isolation and quarantine. The CDC's guidelines provides a useful benchmark in determining whether the Facility's policies and procedures are appropriate. Thus, the standard precautions to prevent the spread of the virus in a correctional setting, such as SCP Schuylkill, include: limiting operational entrances and exists to the facilities and restricting transfers of detained persons unless necessary to prevent

2

overcrowding; performing pre-intake screening for temperature checks for incoming detainees to identify and address both symptomatic individuals and asymptomatic individuals who had recent close contact to a known COVID-19 case; increasing cleaning and disinfecting frequency for high touch areas; encouraging all staff and detainees to wear a cloth face covering as much as possible; reinforcing healthy hygiene practices amongst the detainee population; providing soap, running water, cloth face masks, and tissues to detainees; implementing "social distancing" strategies to increase the physical space between incarcerated persons, knowing 6-feet distance is not always possible in a correctional setting; suspending or limiting activities that would likely involve participants being in "closer contact than they are in their housing environment;" and performing daily temperature checks in housing units where COVID-19 cases have been identified.

The CDC further recommended that management in a correctional facility: (a) provide no-touch receptacles; (b) alcohol-based sanitizer where permissible based on security restrictions"; (c) education on mask wear and symptoms; (d) suspend or modify visitation programs where able, promote non-contact visits, and require visitors to wear cloth face coverings and perform verbal screening and temperature checks upon entry; and (e) display educational signage in multiple languages. The CDC also prescribes quarantine and isolation practices for infected detainees as well as testing and contact tracing whenever feasible. Numerous factors can increase a person's risk of severe illness if he/she contracts the virus. The following medical conditions put a person at increased risk of severe illness from COVID-19: cancer, chronic kidney diseases, chronic obstructive pulmonary disease, weakened immune system from organ transplant, obesity, pregnancy, sickle cell disease, smoking, and type 2 diabetes mellitus. Coronavirus Disease 2019 (COVID-19), "People with Certain Medical Conditions," Centers for Disease Control and Prevention (Nov. 2, 2020).

Persons who have the following medical conditions might be at an increased risk: asthma, cerebrovascular disease, cystic fibrosis, hypertension, immuno-compromised state, neurologic conditions, liver diseases, pulmonary fibrosis, thalassemia, type 1 diabetes mellitus. Being a former cigarette smoker places one at a high risk of getting severely sick from COVID-19. Finally, racial, and ethnic minorities may also be at an increased risk due to societal inequities, such as access to health care and poorer living conditions. Coronavirus Disease 2019 (COVID-19), "Health Equity Considerations and Racial and Ethnic Minority Groups," Center for Disease Control and Prevention (July 24, 2020).

In recognition of the CDC's guidance, the Federal Bureau of Prisons ("BOP") purportedly took the following steps to combat the virus. On March 13, 2020, the BOP modified the operations in accordance with its "COVID-19 Action Plan." Initially, all social visits, inmate movement, and official staff travel were supposed to be suspended for thirty days. Contractors who enter any BOP facility were supposed to be screened for the virus, and initially admission was supposed to be limited to contractors who performed essential services, and enhanced health screenings for staff in areas of "sustained community transmission" was supposed to be conducted and all new inmates were supposed to be screened for virus "exposure risk factors and symptoms." Any inmate who was asymptomatic but had a risk of exposure was supposed to be quarantined. The quarantine period was supposed to be for a minimum of fourteen days or until cleared by medical staff, and new inmates who were symptomatic were supposed to be placed in isolation until they tested negative for the virus or were cleared by medical staff. In addition, group gatherings were supposed to be limited to permit social distancing as much as possible, all staff and inmates were supposed to be issued face masks, and all staff and inmates were supposed to be encouraged to wear face masks when social distancing could not be achieved.

The BOP did not institute a policy requiring staff to wear face masks until August 27, 2020, and even that guidance contemplated religious exemptions, medical exemptions, and outright refusals to comply with the mask mandate. Further, BOP employees were permitted to continue working even after potential exposure to COVID-19. The BOP, and employees at SCP Schuylkill were aware of the risks posed by COVID-19 as early as January 2020.

Despite being fully aware of the risks posed by the virus, employees at SCP Schuylkill failed to follow any of the basic recommendations of the CDC, or otherwise, take the necessary precautions to prevent the spread of the virus at SCP Schuylkill. As of November 10, 2020, the BOP COVID-19 statistics were as follows: (1) 2,455 inmates and 981 staff had confirmed positive tests; (2) 17, 067 inmates and 1,543 staff had recovered and (3) 135 inmates and 2 staff had died. FCI Schuylkill – where the Plaintiff was housed at the adjacent satellite camp, SCP Schuylkill – had as of November 11, 2020, 4 positive cases among staff, as well as 1 inmate and 1 staff member who had recovered. FCI Schuylkill later became the epic-center for the coronavirus as employees were permitted and/or required to continue working after being exposed to the virus.

On October 15, 2020, Plaintiff was placed in the custody and care of the BOP, and was housed at the SCP Schuylkill satellite camp to begin serving a federal sentence. At the time of his arrival, Plaintiff was 5 feet 8, weighed 185 pounds with a BMI of 30, and with a history of being a smoker. Employees at SCP Schuylkill knew that a BMI of 30 or higher puts one in the "obese" category per CDC, and that with a BMI of at least 30, Plaintiff was obese. Employees at SCP Schuylkill also knew that being a former smoker puts one at risk of getting severely sick per CDC, and that with a history of being a smoker, Plaintiff was at risk of getting severely sick. Employees at SCP Schuylkill knew that the Plaintiff's obesity, as well as his history of smoking, placed him at a high risk of severe illness or death if he were to be exposed to COVID-19.

Prior to December of 2020, Plaintiff had not been tested for the COVID-19 virus. In late December of 2020, a massive COVID-19 outbreak occurred in the main FCI Schuylkill campus that resulted in at least 160 inmates testing positive for COVID-19.

On December 23, 2020, the COVID-19 outbreak made its way to SCP Schuylkill and inmates and staff tested positive for the virus.

Despite the fact that the main FCI Schuylkill institution was the epic-center of the coronavirus, Plaintiff, along with the entire SCP Schuylkill satellite camp population, was haled there to quarantine. Plaintiff initially tested negative for the virus on December 23, 2020 before being quarantined, and while Plaintiff was housed at the epic-center of the virus, he was exposed to the coronavirus. Employees at SCP Schuylkill failed to take any precautionary measures to prevent or stop the spread of the virus and continued working after being exposed to the virus, and as a result of this persistent course of action, on March 2, 2021, and again on September 1, 2021, Plaintiff was again exposed to and placed at risk in contracting the coronavirus virus after multiple individuals tested positive for having COVID-19 at SCP Schuylkill.

On January 24, 2022, Plaintiff submitted an Administrative Claim to the BOP pursuant to the Federal Tort Claims Act for the injuries that he sustained from the failure of employees at SCP Schuylkill to, among other things, follow health and safety protocols to prevent the spread of a contagious disease, and by letter dated February 11, 2022, Plaintiff's Administrative Claim was denied. *See* **Exhibit** A. Plaintiff now brings this action for compensatory damages arising out of the injuries that he sustained from the negligent, wrongful acts and omissions of employees of the Government while acting within the scope of their office or employment with the BOP.

## COUNT ONE: Negligence

4.    Plaintiff adopts and incorporates each and every factual allegation contained in the preceding paragraphs as set-forth herein.

5.    At all times relevant, Plaintiff was confined at SCP Schuylkill serving a federal sentence.

6.    Pursuant to 18 U.S.C. §4042, Defendant owed Plaintiff a legal duty of care, as a federal prisoner in its custody to, among other things, "provide suitable quarters, and provide for the safe keeping, care and subsistence of all persons charged with or convicted of offenses against the United States." This duty of care required the Defendant to protect Plaintiff from the exposure to dangerous prison conditions including the corona virus.

7.    BOP COVID-19 Action Plan also required that employees at all BOP facilities, including, SCP Schuylkill, enforce and strictly follow CDC guidelines to prevent the spread of the virus into the facility. SCP Schuylkill and its employees knew or should have known about the risks and dangers of the coronavirus, but failed to do anything to prevent the spread of the virus into the facility.

8.    Based upon information and belief, employees at SCP Schuylkill negligently or intentionally destroyed records that documented staff with related coronavirus type symptoms.

9.    SCP Schuylkill and its employees breached its duty of care by, among other things, failing to provide suitable quarters and provide for the safekeeping, and care of the Plaintiff, including, failing to follow national guidelines in the prevention and testing for COVID-19, and by otherwise failing to adequately protect the Plaintiff from the exposure to dangerous prison conditions including the coronavirus, and negligently or intentionally destroying records that documented employees with coronavirus symptoms.

7

10.     As a direct and proximate result of the breach, Plaintiff was injured and sustained damages. Plaintiff suffered, and continues to suffer, among other things, loss of sleep, worriation, depression, anxiety, and other known and unknown complications after being exposed to the coronavirus on multiple occasions, while in the Defendant's custody and care.

## COUNT TWO: <u>Negligent Infliction of Emotional Distress</u>

11.     Plaintiff adopts and incorporates each and every factual allegation contained in the preceding paragraphs as set-forth herein.

12.     Defendant, SCP Schuylkill, and its employees created a zone of physical danger when it failed to, among other things, follow national guidelines in the prevention and testing for COVID-19, and by otherwise failing to adequately protect the Plaintiff from the exposure to dangerous prison conditions including the coronavirus.

13.     Defendant, SCP Schuylkill, and its employees knew that the Plaintiff was obese, and had a history of smoking and that he was at a higher risk of severe illness or death if he was exposed to COVID-19. Plaintiff was repeatedly exposed to the coronavirus, and suffered immediate and substantial physical harm.

14.     On March 2, 2021, and September 1, 2021, Plaintiff was exposed to and placed in constant fear of contracting the coronavirus and being infected after multiple outbreaks of the virus at SCP Schuylkill.

15.     Plaintiff sustained severe emotional distress, loss of sleep, worriation, depression, anxiety, mental anguish and continue to be exposed to and placed in constant fear of being infected with the virus that is likely to cause severe physical harm, severe illness, or even death.

**COUNT THREE:    Intentional Infliction of Emotional Distress**

16.    Pleading further and in the alternative, at all times relevant, employees at SCP Schuylkill, deliberately and intentionally destroyed records that documented staff with related coronavirus type symptoms, and then knowingly and willfully failed to follow any CDC guidelines to prevent the spread of the coronavirus into the facility.

17.    At all times relevant, employees at SCP Schuylkill knew that a BMI of 30 or higher puts one in the "obese" category, and that with a BMI of at least 30, Plaintiff was obese.

18.    At all times further relevant, employees at SCP Schuylkill also knew that being a former smoker puts one at risk of getting severely sick, and that with a history of being a smoker, Plaintiff was at risk of getting severely sick. Employees at SCP Schuylkill knew that the Plaintiff was at high risk of severe illness or death if he were to be exposed to the coronavirus.

19.    On December 23, 2020, despite the fact that the main FCI Schuylkill institution was the epic-center of the coronavirus, employees at SCP Schuylkill being fully cognizant of the risks, forced the Plaintiff to the FCI Schuylkill main facility for the sole purpose and with the specific intent of exposing him to the virus so that he could contract the disease and become severely ill or suffer death from the exposure to deadly virus.

20.    This conduct was perpetrated by the agents, servants, and employees of the Defendant within the scope of their employment. Defendant is liable for all of the acts committed by its agents, servants, and employees within the scope of their employment.

21.    Defendant's employees' conduct at SCP Schuylkill as described in the preceding paragraphs was extreme and outrageous and was done intentionally, recklessly, in bad faith and in deliberate disregard of a high degree of probability that emotional distress would result to Plaintiff.

9

22.    Defendant's employees knew or should have known that their conduct would or could cause emotional distress upon the Plaintiff, and in fact it did cause emotional distress upon Plaintiff. Defendant's employees' conduct was malicious, willful, deliberate, and intentional and was done for the sole purpose of inflicting severe emotional distress upon the Plaintiff.

23.    As a result, Plaintiff has suffered physical harm due to the defendant's employees' outrageous conduct, including, but not limited to loss of sleep, headaches, severe mental pain, depression and will continue to suffer severe and extreme emotional distress, loss of sleep, headaches, severe mental pain, and depression as a result of the Defendant's employees' conduct.

## DEMAND FOR RELIEF

a)    WHEREFORE, Plaintiff demands judgment in his favor, and against Defendant, in the amount of Two Hundred Thousand ($200,000) Dollars, as and for compensatory damages.

b)    An award of general and special damages for the Defendant's wrongful acts;

c)    An award of punitive damages for the Defendant's reprehensible and outrageous conduct, and to deter the Defendant's future reprehensible and outrageous conduct;

d)    An award of costs and any reasonable attorney fees incurred in this action; and

e)    For such further and other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on each and every issue triable by jury.

Respectfully submitted,

Tramaine Brown
91240-053-Camp 1
P.O. Box 670
Minersville, PA   17954

10

Tramaine Brown 91240053
SCP Schuylkill
P.O. Box 670
Minersville, PA 17954



RECEIVED
SCRANTON

MAR 17 2022

PER_____
DEPUTY CLERK

U.S. District Court

Middle District of Pennsylvania

235 N. Washington Avenue

Scranton, PA. 18503

