## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **TRAMAINE BROWN,** | : | |
| **Plaintiff** | : | |
| | : | **No. 1:22-cv-00404** |
| **v.** | : | |
| | : | **(Judge Kane)** |
| **UNITED STATES OF** | : | |
| **AMERICA, <u>et al</u>.,** | : | |
| **Defendants** | : | |

### <u>MEMORANDUM</u>

Before the Court is Defendant the United States of America ("United States")'s motion to dismiss for lack of jurisdiction and/or for failure to state a claim upon which relief can be granted and/or for summary judgment filed pursuant to Rules 12(b)(1), 12(b)(6), and 56 of the Federal Rules of Civil Procedure.  (Doc. No. 40.)  Also before the Court is Plaintiff Tramaine Brown ("Plaintiff")'s motion to permanently seal medical records filed by the United States in support of its motion to dismiss and/or for summary judgment.  (Doc. No. 56.)  For the reasons set forth below, the Court will grant the United States' motion to dismiss for lack of jurisdiction pursuant to Rule 12(b)(1), strike the documents filed in support of the United States' motion for summary judgment, and deny as moot Plaintiff's motion to seal his medical records.

## I.    BACKGROUND

Plaintiff Tramaine Brown ("Plaintiff") is a prisoner in the custody of the Federal Bureau of Prisons ("BOP") and is currently under home detention overseen by the Orlando Residential Reentry Manager in Wildwood, Florida.  On March 17, 2022, while he was incarcerated at Federal Correctional Institution Schuylkill in Minersville, Pennsylvania and designated to the

satellite camp at that institution,[1] he commenced the above-captioned action by filing a complaint against the United States pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346, et seq.  (Doc. No. 1.)  Approximately one month later, on April 15, 2022, he filed an amended complaint, adding Ryan Miller ("Miller"), the "Executive Assistant/Camp Administrator/Public Information Officer" at FCI Schuylkill, as a defendant in this action.  (Doc. No. 6 at 2, ¶ 5.)  On that same date, Plaintiff also filed a motion for leave to proceed in forma pauperis (Doc. No. 7), as well as his prisoner trust fund account statement (Doc. No. 8).

On April 21, 2022, the Court granted Plaintiff leave to proceed in forma pauperis, deemed his amended complaint filed, and directed the Clerk of Court to issue a summons with a copy of Plaintiff's amended complaint to the United States Marshal for service upon the United States pursuant to Rule 4(i)(1) of the Federal Rules of Civil Procedure.  (Doc. No. 10.)  In addition, the Court directed the Clerk of Court to serve a copy of the amended complaint on Miller.  (Id.)  On May 16, 2022, the United States was served, and the summons was returned executed.  (Doc. Nos. 13; 14 (indicating that, on May 18, 2022, a copy of the summons and the amended complaint was mailed to the United States Attorney General in Washington, D.C.).)

Following two (2) requests for an extension of time to respond to Plaintiff's amended complaint (Doc. Nos. 15, 17), which were granted by the Court (Doc. Nos. 16, 23), the United States filed a notice pursuant to 28 U.S.C. § 1679, stating that it was substituting itself as the proper defendant for Miller (Doc. No. 18).  In its notice, the United States cited 28 U.S.C. § 2679.  (Id. at 1.)  That Section of Title 28 permits the Attorney General of the United States, or his or her designee, to certify that a federal employee—whose alleged negligent or wrongful act

---

[1] Generally speaking, Plaintiff appears to refer to the institution, as a whole, as "FCI Schuylkill," and to the satellite camp, specifically, as "SCP Schuylkill."  See, e.g., (Doc. Nos. 1, 6, 20, 36).  For consistency purposes, the Court will do the same.

or omission gives rise to a plaintiff's claim—was acting within the scope of his or her employment.  See 28 U.S.C. § 2679(d); 28 C.F.R. § 15.3(a).  Upon this certification, the employee is dismissed from the action, the United States is substituted as the defendant in place of the employee, and the action is thereafter governed by the FTCA.  See id.; Osborn v. Haley, 549 U.S. 225, 229–30 (2007).

Plaintiff, however, subsequently filed a motion to strike the United States' notice of substitution for Miller, as well as a supporting brief.  (Doc. Nos. 26, 27.)  Thereafter, the United States filed a brief in opposition (Doc. No. 30), to which Plaintiff filed a reply brief (Doc. No. 31).  Additionally, after the United States filed its notice of substitution, Plaintiff filed a second amended complaint.  (Doc. No. 20.)  Plaintiff's second amended complaint once again named the United States and Miller as defendants and reasserted claims pursuant to the FTCA.  (Id.) Plaintiff's second amended complaint also asserted for the first time, however, an Eighth Amendment claim against Miller pursuant to Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971) ("Bivens").[2]  (Id.)

In his second amended complaint, Plaintiff alleged that, in October of 2020, while he was housed at FCI Schuylkill and designated to SCP Schuylkill, he had a history of smoking and a BMI of 30, which put him in the "obese category" according to the Center for Disease Control and Prevention ("CDC").  (Id. at 6 (internal quotation marks omitted).)  Plaintiff claimed that these factors put him at high risk of severe illness or death if he were to be exposed to COVID-19 and that the employees at FCI Schuylkill allegedly knew this.  (Id. (internal quotation marks

---

[2]  Because Plaintiff, a federal prisoner, sought monetary damages against Miller, a federal official, the Court construed Plaintiff's second amended complaint as asserting his Eighth Amendment claim against Miller pursuant to Bivens.  (Doc. No. 33 at 3 n.1 (citing Doc. No. 20 at 13–14).)

omitted).)  Plaintiff further claimed that, in December of 2020, there was "a massive COVID-19 outbreak" at FCI Schuylkill, which "result[ed] in at least 160 inmates testing positive for COVID-19."  (Id. (explaining that this outbreak originally started at the main camp at FCI Schuylkill and eventually made its way to SCP Schuylkill, where Plaintiff was housed).)  Plaintiff alleged that, during this time, he was "forced into quarantine or transferred" into housing at the main camp, which had "a much higher security level" than to which he should have been exposed.  (Id.)  Plaintiff also alleged that the "[e]mployees . . . failed to take any precautionary measures to prevent or stop the spread of the virus and continued working after being exposed to the virus[.]"  (Id.)  "[A]s a result of this persistent course of action," Plaintiff was exposed to (but did not contract) the virus on March 2, 2021, and again on September 1, 2021.  (Id.)

In connection with these allegations, Plaintiff set forth five (5) counts in his second amended complaint.  (Id. at 7–14.)  The first two (2) counts were asserted against the United States for negligence and negligent infliction of emotional distress.  (Id. at 7–8.)  The final three (3) counts were asserted against Miller for assault and battery, intentional infliction of emotional distress, and a violation of the Eighth Amendment.  (Id. at 9–14.)  For relief, Plaintiff sought compensatory damages against the United States, and compensatory damages, general and special damages, and punitive damages against Miller.  (Id. at 14.)

In response to Plaintiff's second amended complaint, the United States filed a motion to dismiss for lack of jurisdiction and/or for failure to state a claim upon which relief could be granted, as well as a supporting brief.  (Doc. Nos. 21, 22.)  Plaintiff filed a brief in opposition. (Doc. No. 28.)  On March 24, 2023, the Court issued a Memorandum and Order resolving the

United States' motion to dismiss, as well as Plaintiff's motion to strike the United States' notice of substitution.  (Doc. Nos. 33, 34.)

With regard to Plaintiff's motion to strike, the Court: (1) granted the motion as to Plaintiff's Eighth Amendment <u>Bivens</u> claim against Miller, concluding that the United States was not permitted to substitute itself for Miller; and (2) denied the motion as to Plaintiff's FTCA claims for assault, battery, and intentional infliction of emotional distress, concluding that the United States was permitted to substitute itself for Miller.  (<u>Id.</u>)  Regarding the United States' motion to dismiss for lack of jurisdiction (Doc. No. 21), the Court: (1) granted the motion to the extent that Plaintiff's FTCA claims were based upon allegations that the United States failed to adhere to 18 U.S.C. § 4042 and to CDC guidelines and recommendations; and (2) denied the motion to the extent that Plaintiff's FTCA claims were based upon allegations that the United States failed to adhere to the BOP's COVID-19 Pandemic Response Plan ("BOP Response Plan" or "Response Plan").  (<u>Id.</u>)  And, finally, with regard to the United States' motion to dismiss for failure to state a claim, the Court granted the motion and dismissed, with prejudice, Plaintiff's FTCA claims against the United States for assault and battery, as well as Plaintiff's Eighth Amendment <u>Bivens</u> claims against Miller.  (<u>Id.</u>)  However, the Court dismissed, without prejudice, Plaintiff's FTCA claims against the United States for negligence, negligent infliction of emotional distress, and intentional infliction of emotional distress.  (<u>Id.</u>)  In addition, the Court afforded Plaintiff thirty (30) days in which to file a third amended complaint.  (<u>Id.</u>)

On April 24, 2023, Plaintiff filed his third amended complaint under the FTCA against the United States and Miller (incorrectly identified as a Defendant),[3] asserting claims of

---

[3]  As set forth above, the Court previously ruled that the United States <u>was</u> permitted to substitute itself for Miller with respect to Plaintiff's state law tort law claims against Miller.  (Doc. No. 33 at 8–14.)

negligence, negligent infliction of emotional distress, and intentional infliction of emotional distress.  (Doc. No. 36.)  Plaintiff again challenges the conditions of his confinement at FCI and SCP Schuylkill during the COVID-19 pandemic, for which he seeks compensatory damages, general and special damages, punitive damages, costs and attorney fees, and any other relief that the Court deems just and proper.  (Id.)  In support of his request for relief, Plaintiff sets forth the following allegations.

On March 23, 2020, the CDC issued guidance for officials operating correctional facilities in order to help stop the spread of COVID-19.  (Id. at 2.)  This guidance included recommendations about hygiene and cleaning practices, social distancing, evaluating symptoms, and the use of medical isolation and quarantine.  (Id.); see also (id. at 2–4 (discussing the CDC's guidance)).  The BOP "adopted" the CDC's guidance into its Response Plan and "mandated that all employees . . . follow it to combat and prevent the spread of the virus into [its] facilities."  (Id. at 4); see also (id. at 4–5 (discussing the Response Plan)).

Pursuant to the Response Plan, all employees, as well as individuals at SCP Schuylkill, were to be issued face makes and to wear them when social distancing could not be achieved.  (Id. at 5.)  However, the "BOP did not institute a policy requiring staff to wear face masks until August 27, 2020[.]"  (Id.)  In addition, "despite an internal memorandum" that prohibited the "busing of inmates to prison[,]" the BOP began busing inmates (on an unspecified date or dates) from Metropolitan Corrections Center ("MCC") in New York City to FCI and SCP Schuylkill.  (Id.)  Some of those inmates showed symptoms of COVID-19.  (Id.)

Subsequently, on October 15, 2020, Plaintiff entered BOP custody and was housed at FCI Schuylkill.  (Id. at 6.)  Upon his arrival, he was screened by medical staff who became aware, via a physical examination, that he was at "high risk of serious illness or death" if he were to be

6

exposed to COVID-19.  (Id. at 6; id. at 6–7 (citing his obesity, history of smoking, and race and ethnicity as factors that placed him at such risk).)  Plaintiff alleges that medical staff communicated this information to Miller by documenting it in Plaintiff's official medical records.  (Id.)  As a result, Miller either knew or should have known—based upon CDC guidance that was incorporated into the BOP Response Plan—that these various factors placed Plaintiff at a higher risk of severe illness or death if he were to contract COVID-19.  (Id. at 7.)

Also upon his arrival to FCI Schuylkill, Plaintiff was designated to SCP Schuylkill, which, Plaintiff alleges, was "a dangerous condition" for the following reasons: neither inmates nor staff had been tested for COVID-19; the facility was no longer screening any staff member when they entered the complex for work; inmates at SCP Schuylkill were required to work in the medium security portion at FCI Schuylkill, the "epicenter" of COVID-19, and to return to SCP Schuylkill without being screened for the virus; and neither Miller nor any other employee or inmate were wearing "mandatory face masks" or adhering to the Response Plan, "thereby causing the virus to mutate and spread among inmates at the facility[.]"  (Id. at 8.)

In connection with these allegations, Plaintiff claims that Miller "expos[ed] [him] to these dangerous living prison conditions at the time he arrived at the facility on October 15, 2020." (Id.)  Plaintiff also claims that, as a result of Miller's failure to enforce and/or adhere to the Response Plan, "a massive COVID-19 outbreak occurred at the main FCI Schuylkill camp[,]" which "resulted in more than 160 inmates testing positive for [the virus]."  (Id. at 8, 9.)  On December 23, 2020, "the virus made its way" to SCP Schuylkill after Miller "permitted and/or required employees who were symptomatic and/or who had tested positive for the virus to show up for work and interact with inmates . . . thereby resulting in the virus spreading throughout the facility[.]"  (Id. at 8; id. at 9 (stating that Miller "required and/or permitted" employees who were

"asymptomatic and/or symptomatic to continue entering the facility after being exposed to and/or testing positive for the virus")); <u>see also</u> (<u>id.</u> at 7 (alleging that "unknown FCI Schuylkill medical staff . . . negligently and/or intentionally destroyed documents that reflected employees presenting COVID-19 symptoms so that symptomatic employees could continue working, in violation of the Response Plan")).

Despite the fact that the main camp was the "epicenter of the virus," and despite the fact that the main camp is a facility with a much higher severity level than Plaintiff should have been assigned, Miller forced Plaintiff to the main camp on December 23, 2020, "under the threat of disciplinary action[.]" (<u>Id.</u> at 9.) Although Plaintiff initially tested negative for the virus before being "forced into the epicenter of the virus[,]" he was exposed to and tested positive for the virus on February 1, 2021, while being housed at the main camp, which caused him to suffer from severe headaches, shortness of breath, loss of taste, smell and other severe symptoms. (<u>Id.</u> (claiming that he was "repeatedly exposed to the virus and placed at risk of infection and/or reinfection" on March 2, 2021, and September 1, 2021).)

In late March 2021, Miller consolidated SCP Schuylkill's two living quarters into one, making social distancing impossible and causing uninfected individuals to intermingle with those who had contracted COVID-19. (<u>Id.</u>) As a result, Plaintiff—despite having been fully vaccinated—was reinfected with the virus in mid-April 2022. (<u>Id.</u>) As a result, Plaintiff was extremely ill and bedridden for over a week and his pre-existing diagnosis of depression was "exacerbated[.]" (<u>Id.</u> at 9–10.) And, in July 2022, and October 2022, there were "outbreak[s]" at FCI Schuylkill, which placed Plaintiff at risk to be "reinfected" with the virus. (<u>Id.</u> at 10.)

Based upon the foregoing, Plaintiff submitted an administrative claim to the BOP for the "injuries" he sustained as a result of Defendant Miller's failure to adhere to and/or enforce the

Response Plan for "containment, mitigation[,] and prevention of the spread of" COVID-19 "into the facility" and for "exposing him to dangerous prison conditions that resulted in him contracting the virus[.]"  (Id.)  His administrative claim was denied on February 11, 2022.  (Id.)

On June 7, 2023, in response to Plaintiff's third amended complaint, the United States filed a motion to dismiss for lack of jurisdiction and/or for failure to state a claim upon which relief can be granted and/or for summary judgment, along with a supporting brief, statement of material facts, and corresponding exhibits.  (Doc. Nos. 40, 45, 46.)  Plaintiff has since filed an opposition brief, as well as a responsive statement of material facts (Doc. Nos. 53, 54), to which the United States has a filed a reply (Doc. No. 58).  In addition, Plaintiff has also filed a motion to permanently seal his medical records, which were filed by the United States in support of its motion to dismiss and/or for summary judgment.  (Doc. Nos. 56; 57 (containing Plaintiff's supporting brief).)  As reflected by the Court's docket, the United States has not filed a response to Plaintiff's motion.

And, finally, on November 23, 2023, Plaintiff filed a notice, explaining that he amended his administrative claim with the BOP.  (Doc. No. 59 at 1 (explaining that he filed an original administrative tort remedy, SF-95, and claimed damages in the amount of $200,000, but that, in his amended administrative tort remedy, SF-95, he claims damages in the amount of $850,000).)  Thus, the parties' respective motions are ripe for the Court's resolution.

## II.      LEGAL STANDARD

"A challenge to subject matter jurisdiction under Rule 12(b)(1) may be either a facial or a factual attack."  Davis v. Wells Fargo, 824 F.3d 333, 346 (3d Cir. 2016). "A court ruling on a facial attack considers only the complaint, viewing it in the light most favorable to the plaintiff." Long v. SEPTA, 903 F.3d 312, 320 (3d Cir. 2018) (citation omitted).  However, a court ruling on a factual attack, wherein the defendant contests the truth of the jurisdictional allegations, "is a different matter: the court need not treat the allegations as true[.]"  See id. (citations omitted).

"In reviewing a factual attack, the court may consider evidence outside the pleadings." Gould Elecs. Inc. v. United States, 220 F.3d 169, 176 (3d Cir. 2000) (citation omitted).  Indeed, "[b]ecause at issue in a factual 12(b)(1) motion is the trial court's . . . very power to hear the case[,] there is substantial authority that the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case."  See Mortensen v. First Fed. Sav. & Loan Ass'n, 549 F.2d 884, 891 (3d Cir. 1977).  In other words, "no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims."  See id.

## III.     DISCUSSION

### A.      The United States' Motion to Dismiss for Lack of Jurisdiction

The United States has filed a motion to dismiss Plaintiff's third amended complaint for lack of jurisdiction pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure.  (Doc. No. 40.)  In support, the United States argues that the discretionary function exception applies to Plaintiff's FTCA's claims and thus immunizes the Government from suit.  (Doc. No. 46 at 18– 24.)  Plaintiff argues, however, that this exception does not apply here.  (Doc. No. 53 at 15–18.)

The Court, having reviewed the parties' respective arguments and the law governing this exception to the FTCA, is persuaded by the United States' position.

As previously explained by this Court (Doc. No. 33 at 8–9, 16–18), "[t]he United States, 'as a sovereign, is immune from suit unless it consents to be sued.'"  See S.R.P. ex rel. Abunabba v. United States, 676 F.3d 329, 332 (3d Cir. 2012) (quoting Merando v. United States, 517 F.3d 160, 164 (3d Cir. 2008)).  The FTCA, however, authorizes suits against the United States "for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."  See 28 U.S.C. § 1346(b)(1).

Accordingly, "[t]he FTCA is a 'partial abrogation'" of the United States' sovereign immunity, see Abunabba, 676 F.3d at 332 (quoting Gotha v. United States, 115 F.3d 176, 179 (3rd Cir. 1997)), because it authorizes suits against the United States for such negligent or wrongful acts or omissions of federal employees while acting within the scope of their employment.  See 28 U.S.C. § 1346(b)(1); Rinaldi v. United States, 904 F.3d 257, 273 (3d Cir. 2018) (explaining that "[t]he FTCA offers a limited waiver of the federal government's sovereign immunity from civil liability for negligent acts of government employees acting within the scope of their employment" (citations omitted)).

The FTCA, however, "'imposes a significant limitation'" on this partial abrogation of sovereign immunity, see Abunabba, 676 F.3d at 332 (quoting Gotha, 115 F.3d at 179), by providing that the provisions of the Act shall not apply to:

> [a]ny claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not

such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a <u>discretionary function</u> or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

See <u>id.</u> (emphasis added) (quoting 28 U.S.C. § 2680(a)); <u>Baer v. United States</u>, 722 F.3d 168, 172 (3d Cir. 2013) (explaining that "[t]he discretionary function exception limits [the waiver of the federal government's sovereign immunity by] eliminating jurisdiction for claims based upon the exercise of a discretionary function on the part of an employee of the government" (citing 28 U.S.C. § 2680(a)).

As explained by the Third Circuit, "[t]his discretionary function exception 'marks the boundary between Congress' willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals.'" See <u>Abunabba</u>, 676 F.3d at 332 (quoting <u>United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)</u>, 467 U.S. 797, 808 (1984)).  That said, this discretionary function exception "does not apply to every situation in which there is an actual option to choose between courses of action or inaction[,]" but rather, "it immunizes from second-guessing legislative and administrative decisions grounded in social, economic, and political policy."  See <u>id.</u> (citation, internal citation, and internal quotation marks omitted).  And, ultimately, it is the federal government who bears the burden to show that the exception applies.  See <u>id.</u> at 333 (citing <u>Merando</u>, 517 F.3d at 164).

Before determining whether the federal government has met its burden of showing that the exception applies to a plaintiff's FTCA claim, the Court must first identify the conduct at issue in that claim.  See <u>id.</u> at 334 (citing <u>Merando</u>, 517 F.3d at 165).  Once the Court has identified the conduct at issue, the Court is required to conduct a two (2)-part inquiry to

determine whether the discretionary function exception immunizes the federal government from an FTCA suit arising out of such conduct.  See id. at 332–33.

The first part of the inquiry requires the Court to determine whether the conduct giving rise to the alleged injury and, thus, the FTCA suit, involved "an element of judgment or choice." See id. at 333 (citations and internal quotation marks omitted).  "[W]hen a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow[,]" the discretionary function exception does not apply because "the employee has no rightful option but to adhere to the directive."  Berkovitz by Berkovitz v. United States, 486 U.S. 531, 536 (1988); see also Gaubert, 499 U.S. at 324 (explaining that, if the employee violates, for instance, a mandatory regulation, "there will be no shelter from liability because there is no room for choice and the action will be contrary to policy").  If, however, a specific course of action is not prescribed for the employee to follow, then the Court proceeds to the second part of the inquiry. See Abunabba, 676 F.3d at 333.

Under the second part of the inquiry, the Court must consider "'whether the challenged action or inaction is of the kind that the discretionary function exception was designed to shield.'"  See id. (quoting Gotha, 115 F.3d at 179) (some internal quotation marks omitted). Indeed, "[o]nly those decisions "susceptible to policy analysis" are protected by the exception." See id. at 336 (quoting Gaubert, 499 U.S. at 325).  "When established governmental policy, as expressed or implied by statute, regulation, or agency guidelines, allows a Government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion."  Gaubert, 499 U.S. at 324.

However, "[t]hat presumption . . . can be rebutted."  See Abunabba, 676 F.3d at 336 (citing Cestonaro v. United States, 211 F.3d 749, 755 n.4 (3d Cir. 2000)); see also Gaubert, 499

U.S. at 324–25 (instructing that a complaint can survive a motion to dismiss by alleging "facts which would support a finding that the challenged actions are not the kind of conduct that can be said to be grounded in the policy of" a statute, regulation, or agency guidelines, and explaining that "[t]he focus of the inquiry is not on the agent's subjective intent in exercising the discretion conferred by statute or regulation, but on the nature of the actions taken and on whether they are susceptible to policy analysis" (footnote omitted)).

### 1.    Element of Judgment or Choice

Here, the Court begins, as it must, by identifying the conduct at issue.  See Abunabba, 676 F.3d at 334.  The crux of Plaintiff's third amended complaint is that Miller (and other unidentified employees) failed to adhere to the BOP Response Plan.  (Doc. No. 36 (discussing the following acts and omissions that allegedly occurred at FCI and/or SCP Schuylkill: failing to test for COVID-19; failing to require employees and inmates to wear face masks; failing to screen employees when they entered the complex for work; allowing employees to continue working after being exposed to or testing positive for COVID-19 and destroying documentation reflecting such work; failing to require inmates to quarantine and practice social distancing; moving inmates back and forth from the satellite camp to the medium security portion of the facility; and authorizing consolidation of two living quarters into one at SCP Schuylkill).)

The United States argues that, because the BOP developed the Response Plan based upon CDC guidance, and because no federal law or agency mandated any particular conduct in the Response Plan, the alleged acts and/or omissions of the employees at FCI and SCP Schuylkill involved an element of judgment or choice.  (Doc. No. 46 at 20–22.)  And, because the employees' challenged conduct involved such an element of judgment or choice, the United

14

States contends that it has satisfied the first part of the inquiry under the discretionary function

exception.  (Id.)  The Court agrees.

Federal statutory law entrusts the BOP with the responsibility to "provide suitable

quarters" and for "the safekeeping, care, and subsistence of all persons charged with or convicted

of offenses against the United States[.]"  See 18 U.S.C. § 4042(a)(2).  Although this statutory

law requires the BOP to provide a general duty of care to manage and safekeep its prisoners, the

Third Circuit has consistently held that the BOP retains discretion with respect to how it fulfills

that general duty of care.  See, e.g., Rinaldi, 904 F.3d at 273–74 (concluding that 18 U.S.C. §

4042 affords the BOP discretion in deciding suitable housing assignments for inmates); Ruiz v.

United States, 664 F. App'x 130, 133 (3d Cir. 2016) (unpublished) (stating that "this statute

leaves the implementation of these duties to the discretion of BOP officials . . . "); Thrower v.

United States, 528 F. App'x 108, 111 (3d Cir. 2013) (unpublished) (stating the same) (citations

omitted); Donaldson v. United States, 281 F. App'x 75, 77 (3d Cir. 2008) (unpublished) (stating

the same).

However, although the BOP retains discretion in fulfilling this general duty of care,

Plaintiff argues that Miller and other unidentified employees lacked discretion in how to contain,

mitigate, and prevent the spread of COVID-19 at FCI and/or SCP Schuylkill because the BOP

Response Plan is a mandatory policy that Miller was required to follow.  (Doc. No. 53 at 16.)  In

support, Plaintiff cites to his third amended complaint (id.) wherein he asserts that the BOP

"adopted" the Response Plan based upon CDC guidance and "mandated that all employes . . .

follow it to combat and prevent the spread of the virus into [BOP] facilities."  (Doc. No. 36 at 4.)

In further support, Plaintiff alleges that a BOP memorandum was issued on March 26, 2020,

making the Response Plan mandatory at all BOP facilities, including FCI and SCP Schuylkill. (Id. at 6.)

At the outset, the Court observes that Plaintiff's third amended complaint fails to cite to any particular provision of the Response Plan, and, further, a copy of the Response Plan has not been attached to Plaintiff's third amended complaint or submitted in opposition to the United States' motion to dismiss and/or for summary judgment.  In addition, although Plaintiff's third amended complaint generally cites to a URL link that contains numerous versions of the Response Plan (id. at 5), Plaintiff has neither specified which version(s) applies here, nor pointed to any particular provision contained in those versions.  See (id. (citing https://www.bop.gov-/foia/docs/COVID_pandemic_plan_docs_v6_2021_07_16.pdf , which consists of eight (8) versions and one-hundred and sixty-six (166) pages).)[4]  Similarly, although Plaintiff's third amended complaint cites to another URL link that contains various BOP memoranda, spanning from January 2020 to May 2020, Plaintiff has not cited to any particular memorandum contained in that link.  See (id. at 6 (citing https://www.bop.gov/foia/docs/2020_COVID_memos.pdf, which contains one-hundred and twenty-eight pages (128) of various documents).)[5]

In addition, the BOP Response Plan, which appears to have been issued on August 31, 2020, and subsequently modified, came into effect well after any memoranda issued by the BOP on March 26, 2020.  See, e.g., Response Plan, p.5 of 166.  Further, the Court has reviewed the

---

[4]  The Court will cite to this URL link as the Response Plan and indicate the page number upon which the cited information appears in the link.  This page number is located at the top of the link and will be identified by the Court as "p.[the number] of 166."

[5]  The Court will cite to this URL link as the BOP Memoranda and indicate the page upon which the information appears in the link. This page number is located at the top of the link and will be identified by the Court as "p. [the number] of 128."

BOP memoranda contained in Plaintiff's cited URL link, including the memoranda dated March 26, 2020, and the Court finds that there is no explicit reference to or incorporation of the Response Plan or any other suggestion that the Response Plan constitutes a mandatory policy at BOP institutions.  See BOP Memoranda, pp. 44–48 of 128.  Thus, the Court is not persuaded by Plaintiff's broad and unsupported argument that a March 26, 2020 BOP memorandum made the Response Plan a mandatory policy at FCI and SCP Schuylkill.  Furthermore, the Court, having reviewed the contents of the Response Plan, finds that it merely provides guidance and recommended approaches for, rather than imposing mandatory requirements on, BOP employees for managing COVID-19 at their correctional institutions.  In support of this finding, the Court recounts some of its language below.

The Response Plan acknowledges the various challenges associated with the COVID-19 pandemic, "including knowledge gaps about the disease, rapidly changing guidance, no effective prevention (vaccine) or treatments, limitations in testing capacity, difficulty preventing its spread in residential settings like correctional and detention facilities, and severe impacts on institutional and organizational operations created by staffing and supply shortages or large numbers of sick patients."  See Response Plan, p.6 of 166.  The Response Plan also recognizes that the knowledge about COVID-19 and the public health guidance for responding to the pandemic continues to evolve, as it is "being developed and edited frequently to correspond to current guidance from the [CDC] and the World Health Organization [("WHO")][.]"  See id. (stating that there are particularly unique challenges in the "confined correctional environment" because many individuals infected with COVID-19 do not display symptoms and, thus, the virus could be present in correctional facilities before infections are identified).)

In connection with these challenges, the Response Plan explicitly provides that "[it] is designed to provide specific <u>guidance</u> on responding effectively to these challenges—and limiting the spread of COVID-19, its impact on people's lives, and the BOP's missional and operational effectiveness." <u>See</u> <u>id.</u> p.7 of 166 (emphasis added). In addition, the Response Plan, which is divided into numerous modules, further provides that it "will be updated as needed, based on <u>guidance</u> from key stakeholders including the CDC, WHO, and [Department of Justice] and that "<u>recommendations</u> may be revised as new information becomes available." <u>See</u> <u>id.</u>; <u>see also</u> <u>id.</u> pp. 10–156 of 166 (referring, consistently, to the information contained in the Response Plan and the specific modules as "guidance" or "recommendations").

Furthermore, and particularly relevant here to Plaintiff's FTCA claims against the United States, the Response Plan provides the following guidance or recommendations: "[t]he medical management of COVID-19—including testing, housing, and treatment strategies—are clinical decisions and <u>deference</u> should be given to the [Regional Medical Director] regarding these decisions within the clinical context of each situation and scenario that presents at the respective institution[,]" <u>see</u> <u>id.</u> p.11 of 166; "[<u>r</u>]<u>ecommended</u> [personal protective equipment] for incarcerated/detained individuals and staff in a BOP facility <u>will vary</u>" based upon a number of enumerated factors, <u>see</u> <u>id.</u> p.25 of 166; "[v]arious administrative measures <u>should</u> be implemented to maximize social distancing (reduce contact between people) and thereby reduce the chance of spreading viruses[,]" <u>see</u> <u>id.</u> p.15 of 166; referring to COVID-19 screening and testing protocols, as well as isolation and quarantine measures, as "guidance" or recommended "plan[s,]" <u>see</u> <u>id.</u> pp. 64, 67, 68, and 111 of 166; discussing "housing <u>considerations</u>[,]" such as "reassigning bunks to provide more space between individuals, "[i]f space allows[,]" opening

18

vacant housing units to decrease population density, when feasible[,]" and "[m]inimizing the number of individuals housed in the same room as much as possible[,]" see id. p.99 of 166.

Accordingly, for all of these reasons, the Court finds that the BOP Response Plan contains guidance and recommendations and, therefore, does not proscribe or prescribe a mandatory course of conduct for BOP employees to follow in connection with the COVID-19 pandemic. Thus, because the United States has demonstrated that the challenged conduct in Plaintiff's third amended complaint involves an element of judgment or choice, the United States has satisfied the first prong of the discretionary function exception to the FTCA. See, e.g., Johnson v. United States, No. 22-cv-01647, 2023 WL 7635083, at *5 (D. Md. Nov. 14, 2023) ("Johnson")[6] (concluding that "the CDC Guidance and the BOP Response Plan did not impose mandatory requirements relating to the acts and omissions underlying [plaintiff's] FTCA claims during the period of his incarceration[,]" but rather, "they provided only guidance that permitted BOP officials, including those at FCI-Schuylkill and SCP-Schuylkill, to exercise discretion and judgment in deciding how specifically to address the COVID-19 pandemic"); Head v. United States, No. 22-cv-00238, 2024 WL 520037, at *8 (D. Md. Feb. 9, 2024) (explaining that the BOP Response Plan provides "guidance" not "mandatory requirements" and, thus, does not command a particular course of action); Thieme v. United States, No. 21-cv-00682, 2023 WL 8271766, at *5 (D.N.J. Nov. 30, 2023) (finding that the BOP Response Plan "confirm[s] the discretion inherent in testing and quarantine procedures"); Brown v. United States, No. 22-cv-00124, 2023 WL 4744597, at *7 (N.D. W. Va. July 25, 2023) (overruling objection to Report and

---

[6] In Johnson, the pro se plaintiff's fourth amended complaint sets forth parties, claims, and factual allegations that are strikingly similar to those asserted, here, by Plaintiff. See Johnson v. United States of America, No. 8:22-cv-01647 (D. Md. June 8, 2023), ECF No. 28.

Recommendation and stating that "[t]he BOP's own description of its [Response Plan] makes clear that the protocols are not mandatory . . . ").[7]

## 2.    Public Policy Considerations

Because the Court has concluded that the conduct at issue involved an element of judgment or choice, the Court must next determine, under the second part of the inquiry, whether such judgment or choice is of the kind that the discretionary function exception to the FTCA was designed to protect.  See Abunabba, 676 F.3d at 336 (instructing that, "[o]nly those decisions 'susceptible to policy analysis' are protected by the exception" (quoting Gaubert, 499 U.S. at 325)); see also Gaubert, 499 U.S. at 324 (explaining that, "[w]hen established governmental policy, as expressed or implied by statute, regulation, or agency guidelines, allows a Government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion").

Here, because the BOP Response Plan afforded its employees discretion in the development, implementation, and management of health and safety protocols concerning COVID-19 at its correctional institutions, the Court finds that the alleged acts and omissions of Miller and other unidentified employees at FCI and SCP Schuylkill were discretionary and, thus, were presumptively grounded in policy when those employees exercised that discretion.  See Johnson, 2023 WL 7635083, at *5 (concluding the same and explaining, inter alia, that BOP

---

[7]  As set forth above, the Court previously ruled that the FTCA's discretionary function exception applied to Plaintiff's allegations that the United States' employees at FCI and SCP Schuylkill failed to follow CDC guidelines and recommendations during the COVID-19 pandemic.  (Doc. No. 33 at 21–23.)  The Court explained that CDC statements concerning, inter alia, mask wearing, social distancing, and quarantining are advisory in nature and, thus, do not prescribe mandatory conduct for the United States' employees to follow.  (Id. at 21 (citations omitted).)  The BOP Response Plan, much like the CDC guidelines and recommendations, does not impose a mandatory policy, or mandatory requirements, upon BOP employees for managing COVID-19 at their correctional institutions.

decisions on "whether to bus inmates from the MCC to SCP-Schuylkill during the pandemic,

what levels of occupancy to have in particular units within SCP-Schuylkill during the pandemic,

whether and when to designate [plaintiff] to either SCI-Schuylkill or FCI-Schuylkill during a

COVID-19 outbreak[,] whether to consolidate two separate living quarters within SCP-

Schuylkill during the pandemic[,]" whether to provide certain personal protective equipment to

staff, and "whether staff would be called upon to work in the same time frame that they had

COVID-19 symptoms[,]" were all discretionary decisions not mandated by federal statute, CDC

guidance, the "BOP Response Plan[,]" or "Internal COVID-19 Memoranda").

In addition, the United States argues (Doc. No. 46 at 23–24), and the Court agrees, that

the BOP's development, implementation, and management of protocols, taken to safeguard the

health and safety of those confined to and working in its correctional institutions during the

COVID-19 pandemic, is grounded in policy considerations that are appropriately left to the

discretion of prison officials and administrators.  See also Santiago v. United States, No. 21-cv-

00436, 2022 WL 790805, at *3 (W.D. Va. Mar. 14, 2022) (concluding that "the BOP's handling

of COVID-19" and the "development and implementation of safety protocols" that it put into

place were "based on considerations of public policy" and explaining, inter alia, that "[t]he BOP

must balance its duty to protect inmates from COVID-19 with its duty to protect inmates from

each other, to safeguard staff, and to protect the public"); Murillo v. United States Dep't of Just.,

No. 21-cv-00425, 2022 WL 16745333, at *10 (D. Ariz. Nov. 7, 2022) (concluding that BOP

decisions regarding the implementation of any particular infectious disease measure for COVID-

19 in any particular institution were "unquestionably based on considerations of public policy"

(citation and internal quotation marks omitted)).  Thus, because the United States has

demonstrated that the challenged conduct in Plaintiff's third amended complaint involves the

type of judgment or choice that the discretionary function exception to the FTCA was designed to protect, the Court concludes that the United States has satisfied the second prong of the exception.

In reaching this conclusion, the Court upholds the long-standing principles that: "courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform[;]" that "[r]unning a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government[;]" and that this "task that has been committed to the responsibility of those branches, and separation of powers concerns counsel a policy of judicial restraint."  See Turner v. Safley, 482 U.S. 78, 84–85 (1987) (internal citation and internal quotation marks omitted)).  Deference is, therefore, appropriately afforded to BOP prison officials and employees with respect to their decision-making in the development, implementation, and management of COVID-19 at their institutions.  See id.; Whitley v. Albers, 475 U.S. 312, 321–22 (1986) (stating that "[p]rison administrators . . . should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security" (quoting Bell v. Wolfish, 441 U.S. 520, 547 (1979))).

### 3. Conclusion as to the United States' Motion to Dismiss for Lack of Jurisdiction

For all of these reasons, the Court concludes that the United States has met its burden of demonstrating that the FTCA's discretionary function exception applies to Plaintiff's allegations that Miller and other unidentified FCI and SCP Schuylkill employees failed to adhere to the BOP Response Plan during the COVID-19 pandemic.  As such, the Court is divested of jurisdiction to consider Plaintiff's allegations.  The Court will, therefore, dismiss Plaintiff's third amended

complaint.  (Doc. No. 36.)  Additionally, because the Court has resolved the United States'

motion to dismiss on jurisdictional grounds, and not on any merits-related arguments, the Court

will strike the documents filed in support of the United States' motion for summary judgment

and deny as moot Plaintiff's motion to seal his medical records.  (Doc. No. 56.)

## IV.    CONCLUSION

Accordingly, for the foregoing reasons, the Court will grant the United States' motion to

dismiss for lack of jurisdiction.  (Doc. No. 40.)  In addition, the Court will strike the documents

filed in support of the United States' motion for summary judgment and deny as moot Plaintiff's

motion to seal his medical records.  (Doc. No. 56.)  An appropriate Order follows.


s/ Yvette Kane
Yvette Kane, District Judge
United States District Court
Middle District of Pennsylvania